IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CARMEN PRAKEL**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) Civil No. **05-412-MJR** |
| | ) |
| **JO ANNE B. BARNHART**[1], | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

This Report and Recommendation is respectfully submitted to United States District Judge Michael J. Reagan pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C).

Carmen Prakel's August 2003 application for Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 1382 was denied in November 2004 by Administrative Law Judge John M. Wood.  **(R. 55-58; and 13-20).**  In April 2005, the Social Security Administration Appeals Council declined to review ALJ Wood's decision, thereby rendering it the final Agency decision. **(R. 4-6).**  Prakel, represented by counsel, filed the above-captioned action seeking review pursuant to 42 U.S.C. § 405(g).  **(Doc. 1).**  She has also filed a motion for summary judgment and brief elaborating on her complaint for review.  **(Docs. 20 and 21).**  Plaintiff argues:

1. ALJ Wood's decision is against the manifest weight of the evidence;

2. Non-exertional conditions– visual acuity, back pain, leg swelling and uncontrolled sugar levels– were not taken into account;

3. The ALJ's discussion of "visual fields," which are different from "visual

---

[1] Plaintiff's complaint does not refer to the Commissioner of Social Security by name; this Court takes judicial notice that Jo Anne B. Barnhart is the Commissioner.

        acuity," is inappropriate;

4. The impact of corneal astigmatism on plaintiff's ability to work was not properly evaluated;

5. The ALJ mechanically applied the Medical-Vocational Guidelines;

6. The ALJ's decision does not logically bridge the evidence and conclusions with respect to plaintiff's visual deficits; and

7. The ALJ did not specify the frequency at which plaintiff needed to alternate sitting and standing, as required by SSR 83-12 and *Castrejon v. Apfel*, 131 F.Supp.2d 1053 (E.D.Wisc. 2001).

**(Docs 1, 20 and 21).**

## Applicable Legal Standards

To qualify for SSI, a claimant must be "disabled." "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." **42 U.S.C. § 1382c(a)(3)(C).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. § 416.972.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged

to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **See Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992);** *see also* **20 C.F.R. § 416.920(b-f).**

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** Thus, the Court must determine not whether plaintiff is in fact disabled, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made. **See Books v. Chater, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).** The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997).** Furthermore, an ALJ may not disregard evidence when there is no contradictory evidence. **Sample v. Shalala, 999 F.2d 1138, 1143 (7th Cir. 1993).** However, the "substantial evidence" standard does not require the ALJ to address every piece of evidence in his decision; "he must articulate, at some minimum level, his analysis of the record so that the reviewing court can follow his reasoning." **Johansen v. Barnhart, 314 F.3d 283, 287 (7th Cir. 2002).**

A negative answer at any point in the five step analytical process, other than at the third

step, stops the inquiry and leads to a determination that the claimant is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir.1984). If a claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment (step three). If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Commissioner at step four to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).

### Synopsis of the Record

#### The ALJ's Decision

According to plaintiff's application for SSI, she claims disability and entitlement to benefits due to diabetes, high cholesterol and back pain, with an onset date of May 1, 1999. **(R. 55-58).** Plaintiff subsequently indicated she also suffered from arthritis and obesity. **(R. 91).** After surveying plaintiff's medical records, ALJ Wood concluded that plaintiff's diabetes was the only medically determined ailment that was "severe,' as defined by 20 C.F.R. § 416.920. **(R. 15).** In reaching that conclusion, the ALJ analyzed plaintiff's diabetes, vision, back problems and history of chest pain. **(R. 15).**

Plaintiff's diabetes mellitus was not found to meet or equal Listing 9.08 (20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A), which sets forth the criteria for diabetes mellitus to be deemed a presumptively disabling condition. **(R. 16).** More specifically, the ALJ concluded plaintiff lacked the required additional related impairment, in that her vision problems were due to a corneal abnormality, not retinitis proliferans, which is the visual impairment that, in combination with diabetes mellitus, is a presumptively disabling condition. **(R. 16).**

Plaintiff was found to have the residual functional capacity for the full range of medium work, with the sole exception that she has limited far visual acuity, which would eliminate jobs requiring 20/20 binocular vision. **(R. 16-18).** Medium work involves lifting no more than 50 pounds as a time with frequent lifting or carrying up to 25 pounds. **20 C.F.R. § 416.967(c).** If one can do medium work, he or she is also considered capable of light and sedentary work[2]. **20 C.F.R. § 416.967(c).**

Based on the physical requirements of plaintiff's past work, the testimony of vocational expert Bonnie Gladden, and plaintiff's own testimony that she left her last job as a motel housekeeper when she moved to another city, and she still thought she could perform that job, ALJ Wood found that plaintiff could perform her past work and was therefore not disabled, pursuant to 20 C.F.R. § 416.920(e). **(R. 16-17).**

ALJ Wood continued his analysis, in the event plaintiff's past work was found

---

[2]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." **20 C.F.R. § 416.967(b).**

"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." **20 C.F.R. § 416.967(a).**

inapplicable.³ **(R. 17).** He still concluded plaintiff was not disabled, as she could still perform other jobs. **(R. 17-18).** In reaching that conclusion, ALJ Wood used Rules 203.25 and 203.26 of the Medical-Vocational Guidelines (20 C.F.R. Pt. 404, Subpt. P, App. 2) as a framework, and he factored in the aforementioned residual functional capacity assessment with plaintiff's age, education and work experience, and the testimony of vocational expert Gladden about available jobs.

### The Documentary Evidence

Since 1995, plaintiff Prakel has worked as a stock clerk, cashier, in a nursing home, as a personal aid and, most recently, as a housekeeper at a hotel in 2003. **(R. 100-105 (work history and self-described exertional requirements)).** According to the written report of vocational expert Bonnie Gladden, work as a home attendant is generally medium exterional work, but as performed by plaintiff it was light work; work as a cashier, stock clerk and room cleaner were all generally classified as light work, and plaintiff performed them at that level. **(R. 119).**

The sparse medical records reflect that plaintiff had a reported history of diabetes mellitus, since 1999. **(R. 125 and 134).** When plaintiff sought hospital treatment in July 2003 for the loss of her right big toenail, she reported that she had not been taking diabetes medication for eight months because she could not afford it. **(R. 125).** The loss of the toenail was unrelated to diabetes, and at that time plaintiff's glucose level was 170. **(R. 126).** The hospital records indicate there was no blurred vison, no history of breathing difficulty, and no pain anywhere

---

³Only work within the past 15 years is deemed relevant. **20 C.F.R. § 416.965(a).** If work is done only "off-and-on" or for only a "brief periods of time" it is generally not relevant. **20 C.F.R. § 416.965(a);** *see also* **§ 416.972.** Plaintiff's work as a housekeeper in the motel was only for a brief period, three months in 2003. **(R. 262).**

other than the affected toe.  **(R. 127).**

In September 2003, plaintiff indicated in an Activities of Daily Living Questionnaire that she experienced occasional numbness and pain when she stood to cook, shooting pain and weakness when dressing, and sharp back pain when getting out of a chair.  **(R. 108-109).** Plaintiff also reported that she needed occasional assistance washing herself, and often needed assistance carrying things. **(R. 108).**  Plaintiff further reported that she experienced pain in her legs and back when getting in and out of the car, and she had fallen asleep while driving; nevertheless, she was still driving.  **(R. 109).**  Nevertheless, plaintiff was still able to do laundry and clean.  **(R. 109).**  According to plaintiff, she experienced pain after sitting for 15-20 minutes, and she needed to rest 1-2 hours each day.  **(R. 109).**

One month later, in October 2003, plaintiff was examined by Dr. Carl Otten for a consultative exam in connection with her application for SSI.  **(R. 133-137).**  At that time plaintiff, who is 68 inches tall, weighed 300 pounds (a BMI of 46), and smoked up to two packs of cigarettes per day.  **(R. 134 and 137).**  Plaintiff reported fatigue upon exertion, but Dr. Otten found she maintained a full range of motion in all extremities and her spine, and her gait was normal.  **(R. 135-136).**  Dr. Otten found plaintiff's visual acuity without correction to be OD (right eye) 20/50 and OS (left eye) 20/100.  **(R. 135).**  Dr. Otten diagnosed plaintiff as having non-insulin dependent diabetes mellitus, decreased visual acuity, dental carries, decreased exercise tolerance and obesity.  **(R. 137).**  At that same time, x-rays were taken of plaintiff's low back; they were normal.  **(R. 138).**

In December 2003 plaintiff sought treatment for diminished distance and near sight; at that time she was not using glasses or contact lenses.  **(R. 139-140).** According to Dr. William

Zeh of the Prairie Eye Center, plaintiff's right eye, without correction, was 20/400, with near vision of J3; and her left eye had distance vision of 20/200, with near vision of J7.  **(R. 139).**  With correction, plaintiff's right eye vision was 20/50, and her left eye vision was 20/60.  **(R. 139).**  Dr. Zeh found an extremely high amount of corneal astigmatism: 4.75 diopters in the right eye, and 5.50 diopters in the left eye– likely the main cause for plaintiff's decreased vision.  **(R. 139)**.  Otherwise, plaintiff's gross visual fields were characterized as normal, and no diabetic retinopathy was found.  **(R. 139).**  Dr. Zeh opined that spectacle correction would offer moderate improvement, and it was possible that there would be greater improvement with rigid gas permeable contact lenses.  **(R. 139).**

In response to an agency request for medical advice regarding plaintiff's vision, Dr. Rachel Gotanco concluded there were no restrictions on plaintiff's visual fields, but her visual acuity was diminished due to corneal astigmatism.  **(R. 143).**  Dr. Gotanco indicated any residual functional capacity assessment should restrict visual acuity to 20/50 OD (right eye) and 20/60 OS (left eye), thereby restricting plaintiff from jobs requiring 20/20 binocular vision.  **(R. 143).**

Based on the aforementioned records and diabetes diagnosis, agency physicians concluded plaintiff had the residual functional capacity to lift 50 pounds occasionally and 25 pounds frequently, stand and/or walk for six hours during an eight hour work day, sit for six hours during an eight hour work day, but also had a far vision restriction based on her best corrected vision of 20/50.  **(R. 144-151).**

Plaintiff also submitted a written log of her self-reported "sugar levels" for the period between February through November 2004, generally showing her glucose level above 200.  **(R. 75-76, 88-89, and 121-123).**

On September 13, 2004, plaintiff sought hospital treatment for chest pain. **(R. 155-156).** At that time her glucose level was 241, and ischemic heart disease was deemed possible. **(R. 155-156).** By the next day, plaintiff's glucose level was 133, a cardiac work-up was all negative, and anxiety was the suspected cause of plaintiff's condition. **(R. 176-177).** However, x-rays taken at that time indicated mild degenerative changes at the thoracolumbar junction, gallstones and fatty infiltration of the liver. **(R. 182).**

### Plaintiff's Testimony

On November 16, 2004, plaintiff testified at a hearing before ALJ Wood. **(R. 249-286).** At that time, she was 39 years old and reported that she stood 68 inches tall and weighed 275 pounds. **(R. 253).** During the relevant time period, plaintiff was married, and living in a trailer with her husband, but they apparently were informally separated at the time of the hearing. **(R. 253 and 272).** Plaintiff completed the ninth grade, but never obtained a GED. **(R. 260).** Her last formal job was working as a housekeeper in a one-story, 17-room motel; she stopped when she moved to a different town. **(R. 262).** Plaintiff thought she was still able to perform that job, if she still lived nearby. **(R. 262-263).** Plaintiff also indicated she babysits periodically. **(R. 261).**

Plaintiff drove herself to the hearing on an expired driver's license. **(R. 257).** She explained that she last took the vision portion of the driving test four or five years ago, and her vision problems– spots and blurred vision– only occur when her blood sugar is high, so she continues to drive. **(R. 257-258).**

According to plaintiff, her back is what troubles her most; it hurts when she stands, and

there are days when she cannot get up. **(R. 264-265).** However, plaintiff acknowledged she has never obtained medical confirmation of a back problem**. (R. 274).** Plaintiff reported being able to watch television for 30-45 minutes, until back pain forces her to get up; then, she can only stand for 10-15 minutes before her toes are "on fire" and then go numb. **(R. 267).** On a typical day, plaintiff feeds and then plays with her two dogs, washes dishes, takes out the trash and straightens up her trailer, vacuums, grocery shops, cooks meals, visits with neighbors, and watches television. **(R. 270-271).** Plaintiff tends to her own hygiene, although her husband would be nearby in case she became dizzy. **(R. 267-268).**

Plaintiff takes Glucovance and Actos for her diabetes, Protonix for stomach heartburn, and something for high cholesterol. **(R. 274).**

### Vocational Testimony

Vocational expert Bonnie Gladden was presented with multiple hypothetical situations regarding a person of plaintiff's age, education and work history, based on varying residual functional capacities. **(R. 279-283).** The first hypothetical corresponds to the ALJ's conclusions that plaintiff had the residual functional capacity for a full range of medium work, limited only with regard to far visual acuity. **(R. 279).** Gladden opined that all of plaintiff's past work could be performed by such a person. **(R. 279-280).** Gladden also stated that other similar jobs would also available, such as cashier at the sedentary, light and medium levels, room cleaner at the medium and light levels, and home attendant at the light and medium levels– *all* available by the thousands. **(R. 283).** Adding the need to avoid heights, dangerous machinery, ladders and the like did not alter Gladden's assessment that such a person could still perform all of plaintiff's past work. **(R. 280).** According to Gladden, if the exertional level were decreased to light work,

only work as a home attendant would be precluded. **(R. 280).** Adding the need for a sit/stand option would limit such a person to the cashier positions at the medium, light and sedentary levels. **(R. 280-281).** Gladden elaborated that at some stores, such as Lowe's Home Improvement and Best Buy, cashiers are allowed to use a stool. **(R. 280-281).**

## Analysis

The linchpin of any disability claim is that the claimant is no longer capable of gainful activity. **42 U.S.C. § 1382(a)(3)(A).** Therefore, as a preliminary matter, the Court must note that during the November 2004 hearing before ALJ Wood, plaintiff thought herself capable of returning to her previous job cleaning a one story motel. **(R. 262-263).** Plaintiff has made no mention of that in her appeal. With that said, the Court will proceed through the five-step analytical process, addressing plaintiff's arguments in turn.

There is no dispute that plaintiff has not been employed since 2003, when she worked for three months as a housekeeper in a one-story motel. **(R. 262).** Although the ALJ recognized that this work could possibly not qualify as past relevant work (*see* 20 C.F.R. § 416.965(a) and § 416.972), plaintiff has not argued the point; therefore, it is waived. In any event, this Court finds it dispositive that plaintiff only stopped working as a housekeeper because she moved, and she opined that she was still capable of performing that work in November 2003.

At step two in the analytical process ALJ Wood found that plaintiff's diabetes mellitus was a "severe" impairment. Plaintiff does not take issue with this conclusion per se. Insofar as plaintiff's high cholesterol, back pain, arthritis and obesity were not deemed severe, the Court notes the lack of documentary evidence of medical diagnoses. Furthermore, for reasons

analyzed more fully below, these conditions do not significantly limit plaintiff's ability to perform basic work activity.  *See* **20 C.F.R. §§ 416.920(a) and (c).**  Plaintiff's two more prominent ailments, her obesity and vision, will be discussed briefly at this juncture.

It should also be noted that although Plaintiff weighs in the vicinity of 300 pounds, obesity is no longer considered a disabling condition per se; Listing 9.09 was deleted from Appendix 1 in October of 1999.  *See* **20 C.F.R. Pt. 404, Subpt. P, App. 1 § 9.09 (1998).**  However, the regulation regarding the effects of obesity on musculoskeletal disorders provides:

> [W]hen determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

**20 C.F.R. Pt. 404, Subpt. P, App. 1 §1.00(Q);** *see also* **Social Security Rulings 00-3p and 02-1p.**  Plaintiff's weight is relevant to her residual functional capacity, which is analyzed below.

With respect to plaintiff's visual acuity, plaintiff's corrected vision in her better eye is 20/50, and Listing 2.02 requires the corrected vision in the better eye to be 20/200 or worse; therefore, plaintiff cannot satisfy Listing 2.00(A)(2).  Moreover, plaintiff still drives and does not wear corrective lenses.  Therefore, there is sufficient evidence in the record to support the conclusion that her vision is not a severe impairment.

Although plaintiff's diabetes mellitus was characterized as severe at step two, for purposes of step 3 that condition does not satisfy Listing 9.08, which requires one to have diabetes mellitus with:

> A. Neuropathy demonstrated by significant and persistent disorganization of

motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C); or

B. Acidosis occurring at least on the average of once every 2 months documented by appropriate blood chemical tests (pH or pCO2 or bicarbonate levels); or

C. Amputation at, or above, the tarsal region due to diabetic necrosis or peripheral arterial disease; or

D. Retinitis proliferans; evaluate the visual impairment under the criteria in 2.02, 2.03, or 2.04.

**20 C.F.R. Pt. 220, App. 1, § 9.08.**

Plaintiff only addresses the applicability of the visual component of Listing 9.08. Plaintiff's assertion that her vision is "pretty much listing severity" **(Doc. 1, p. 3)** is insufficient. Dr. Zeh specifically stated that plaintiff has no diabetic retinopathy. **(R. 139).** As noted above, plaintiff's vision does not satisfy Listing 2.02. Listing 2.03, requiring a diminished peripheral visual field, is also not satisfied, in that Dr. Zeh specifically noted that plaintiff's gross visual fields were "normal." Dr. Gotanco reached the same conclusion. Although Dr. Zeh discussed minor constrictions on visual fields, plaintiff has not raised this issue, so it is deemed waived.[4] Similarly, plaintiff has failed to address Listing 2.04, which pertains to loss of visual efficiency.

At step four, ALJ Wood concluded plaintiff could perform her past work as a motel housekeeper. Plaintiff herself thought she could perform that job, and she only stopped working at that position because she moved. **(R. 162).** Plaintiff does not take issue with this conclusion

---

[4] Plaintiff takes issue with the ALJ's mention of visual fields. Plaintiff correctly observes that visual fields and visual acuity are "apples and oranges." **(Doc. 1, p. 3).** However, the ALJ did not confuse the two; he merely reflected Dr. Zeh and Dr. Gotanco's findings that visual fields were normal. **(R. 16).**

per se; therefore the ALJ's conclusion at step four should obviate further analysis. *See* **20 C.F.R. § 416.920(e).** Nevertheless, the ALJ raises the question of whether plaintiff's past work as a motel housekeeper is appropriately considered, presumably because it was only for a three month period. Again, plaintiff has failed to address this point, so it is deemed waived. With that said, there is support for deeming that past work relevant, in that the position was unskilled **(R. 119)**, and plaintiff moved away from the job, and did not stop working because of physical impairment.

Key to steps four and five is plaintiff's residual functional capacity. *See* **20 C.F.R. § 416.945 and SSR 96-8p**. ALJ Wood concluded plaintiff remained capable of performing the full range of medium work, restricted only with respect to her far vision acuity, which would preclude jobs requiring 20/20 binocular vision. **(R. 16-17 and 19).** Plaintiff takes issue with the ALJ's analysis, generally asserting that plaintiff's visual acuity, particularly her corneal astigmatism, back pain, leg swelling and uncontrolled sugar levels were given short shrift.

By plaintiff's account, she remains able to tend to her own needs– cooking, cleaning, laundry, grocery shopping and personal hygiene. Plaintiff described having her husband nearby while she bathed, in case she became dizzy. However, her husband had not been living with her for six weeks, and she did not indicate an inability to bathe or carry on without his presence. Furthermore, there are no medical records or even personal accounts of her falling. Although plaintiff testified that she could only sit for 30-45 minutes at a time, and stand for 10-15 minutes, she also testified that she had made the three hour trip to the hearing, albeit with discomfort.

Dr. Zeh thought corneal astigmatism was likely the main cause of plaintiff's decreased vision. Regardless of the cause of plaintiff's diminished visual acuity, according to Dr. Zeh, eye

glasses would offer moderate improvement, up to 20/50 in the right eye and 20/60 in the left eye. That degree of corrected vision was, per Dr. Gotanco, the basis for the ALJ's restriction regarding work that required 20/20 binocular vision. This Court cannot discern what further impact plaintiff thinks the ALJ should have evaluated. There is nothing to indicate that plaintiff's corneal astigmatism was in any way related to her diabetes. Insofar as plaintiff complained of blurred vision and seeing spots when her blood sugar was high, she explained that that only occurred when she *forgets* to take her medication. **(R. 264).** Failure to follow prescribed treatment without a good reason will preclude an award of benefits. **20 C.F.R. § 416.930.**

Plaintiff submitted months of her self-reported glucose levels, most of which were over 200. ALJ Wood recognized that plaintiff's diabetes was uncontrolled at times, but he did not specifically discuss plaintiff's logs. **(R. 16).** As noted above, plaintiff testified that she sometimes forgets to take her medication. ALJ Wood further noted that plaintiff indicated she could not always afford her medication, yet she had the money for a two-pack-a-day cigarette habit. **(R. 16).** Nevertheless, medical records reflect that she has *non-insulin dependent* diabetes mellitus, and there is no objective medical evidence that plaintiff had complications, or that she sought further treatment; she did not even make complaints to the few doctors she did see. Therefore, the ALJ's failure to specifically discuss the logs is of no import to the residual functional capacity assessment.

Plaintiff acknowledges that she has never been medically diagnosed with a back problem. X-rays of plaintiff's lower back in October 2003 were normal, and she maintained a full range of motion in all extremities and a normal gait. X-rays in September 2004 showed only mild

degenerative changes.  As noted above, plaintiff remained capable of performing the activities of daily living.  Most telling is that plaintiff does not take any pain medication for her back pain.

Plaintiff's complaints of ankle/leg swelling when she stands are not reflected in her medical records.  Again, plaintiff's opinion that she was still capable of working as a housekeeper undercuts any assertion that this factor alters the ALJ's finding regarding residual functional capacity, or tips the balance in favor of disability.

A December 2003 residual functional capacity evaluation based on a record review indicated plaintiff was capable of lifting 50 pounds occasionally and 25 pounds frequently, sitting for up to six hours of an eight hour work day, and standing and/or walking for six hours of an eight hour work day.  **(R. 144-151).**  That clearly comports with the requirements for medium, light and sedentary exertional work.  **20 C.F.R. §§ 416.967(a)-(c).**  By plaintiff's own account in November 2004, she thought herself capable of performing light exertional work, even with all of her back pain, leg swelling and other complaints.  **(*See* R. 119 and 263).**

In his alternate analysis, ALJ Wood concluded that, based on the residual functional capacity for the full range of medium exertional work, and the framework of the Medical-Vocational Guidelines relative to a "younger" person, 39 years old, with a ninth grade education and no transferable skills, a finding of not disabled is directed.  **20 C.F.R. Part 404, Subpart P, Appendix 2, §§ 203.25 and 203.26.**  Plaintiff asserts that the ALJ mechanically applied the Guidelines.  That assertion is specious.

When the Guidelines cannot be strictly applied due to variations in exertional or nonexertional limitations (such as diminished visual acuity), then a vocational expert is used to determine whether there are a significant number of jobs in the national economy that could still

be performed.  **20 C.F.R. §§ 416.1569 and 1569a; and 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00.**  ALJ Wood correctly used the Guidelines as a framework, and then consulted vocational expert Gladden.  Gladden was presented with multiple hypotheticals based on a variety of possible findings stemming from the record evidence and plaintiff's own testimony.  The first hypothetical corresponds to the ALJ's conclusions that plaintiff had the residual functional capacity for a full range of medium work, limited only with regard to far visual acuity.  **(R. 279).**  Gladden opined that all of plaintiff's past work could be performed by such a person.  **(R. 279-280).**  Gladden also stated that other similar jobs would also be available, such as cashier at the sedentary, light and medium levels, room cleaner at the medium and light levels, and home attendant at the light and medium levels– *all* available by the thousands.  **(R. 283).** Having concluded the ALJ correctly assessed plaintiff's residual functional capacity, it follows that this hypothetical was an accurate reflection of plaintiff's situation and therefore is a proper premise upon which to base the ultimate determination that plaintiff is not disabled.

Plaintiff argues that the ALJ did not specify the frequency at which plaintiff needed to alternate sitting and standing, as required by SSR 83-12 and *Castrejon v. Apfel*, 131 F.Supp.2d 1053 (E.D.Wisc. 2001).  This argument is a non-starter because plaintiff was not found to need a sit-stand option.  Plaintiff's residual functional capacity assessment is fully analyzed above and need not be rehashed.

Plaintiff's general arguments that the ALJ's decision failed to provide a logical bridge between the evidence and the conclusions, and that the ALJ's decision is against the manifest weight of the evidence are generally addressed above and do not warrant any further discussion.

### Recommendation

For the aforestated reasons, it is the recommendation of this Court that the final decision

denying claimant Prakel SSI benefits be upheld in all respects and that judgment be entered accordingly.

**DATED: February 9, 2007**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**

**NOTICE**

In accordance with 28 U.S.C. 636(b) and Federal Rule of Civil Procedure 6(e) the parties have until **March 1, 2007**, to file their objections to this report and recommendation. No extensions will be granted.